Halsted *v.* Tyng.

## HALSTED *vs.* TYNG and others.

1. A vessel was bought at sheriff's sale, under an agreement by the purchaser with the defendant in execution, that the defendant could redeem, at a certain day, by paying a greater sum, and that for part of that time, the vessel was to be in the joint possession and control of both parties— *Held*, that after the time for joint possession had expired, the defendant in execution had no right to meddle with, or take possession of, the vessel until he had redeemed it; and that taking it out of possession of the purchaser was a trespass.

2. The time fixed in an agreement between a purchaser at sheriff's sale and the owner of the property sold, made upon the sale, for a conveyance of the property back upon the payment of a fixed price, will be made of the essence of the contract, by a provision that failure to pay at the time shall end the right.

3. If a purchaser at sheriff's sale agree to re-convey the property, upon being repaid the purchase money and other advances to be made by him, the amount of which is unknown to the party to whom the re-conveyance is to be made, and upon demand made at the time fixed for re-conveyance, fails to render a proper statement of such advances, the time for re-conveyance will be extended, although made expressly part of the essence of the contract. The party to make payment is not in fault until a proper account is rendered, if demanded.

---

* The assignment was held valid on appeal; decree reversed accordingly, 4 *C. E. Gr.* 462.

*Complainant, pro se.*

*Mr. McCarter,* for defendants.

THE CHANCELLOR.

The controversy in this cause is about a submarine boat. There are two questions. The first is, whether the defendant, Tyng, is now, and was, in September, 1865, the sole owner of the boat and entitled to the exclusive possession of it; the second, whether the complainant and his associates are entitled to have the boat conveyed to them upon making payment of certain amounts, according to an agreement made June ninth, 1865; or whether they have lost that right by their laches in making payment or tender.

This boat, claimed to be a very valuable and useful invention, was built by the complainant and his associates, incorporated by the name of the American Submarine Telegraph Company. The boat, when in part constructed, was seized or attached for the cost of its construction, in the city of New York, and on the ninth of June, 1865, was in possession of the sheriff of the county of New York, and advertised to be sold by him on the next day. The complainant was the principal stockholder of the company, and had control of it by holding a majority of the stock issued.

Under these circumstances, on the ninth of June, 1865, a written agreement was entered into between the complainant, and the defendant, Tyng. This recited that the complainant and Tyng contemplated re-organizing together a submarine company, in accordance with a prospectus of the same date, and recited the attachment and contemplated sale. And by it, Tyng agreed to represent the complainant and his associates at that sale, and, if practicable, to buy in the boat and its apparatus for $2468, or thereabouts, taking the title in his own name, but for the benefit and advantage of himself and the company so to be re-organized; and in case of failure of the organization of said company, for the benefit and advantage of the complainant and his associates, upon their refunding to him, within sixty days from the

purchase, the purchase money, and other moneys which he might advance to or for the complainant, with interest, and $750 as commission for his services.

Tyng agreed also to advance to the complainant $1000. Tyng was to have thirty days from the sale to organize a company, as provided. If he did not organize the company within that time, and Halsted did not extend it, then Halsted and his associates had the right to reimburse to him the purchase money, advances, interest, and commissions, within sixty days from the sheriff's sale, and have the boat and its apparatus re-transferred, upon a written order, to themselves, or any person they should direct.

It was agreed, that pending the organization mentioned, Halsted and Tyng should have joint and equal possession of the boat for finishing, experimenting with, and operating the same, in such manner as they might deem best, and as should be agreed upon. And it was stipulated, that if the purchase money and interest, and all money advanced by Tyng to Halsted, or on his order, with interest and said commissions, should not be repaid to Tyng within sixty days from the sheriff's sale, then (provided the said company should not have been re-organized, as contemplated,) the trust reposed in Tyng should cease, and he should thereupon become the sole and separate owner of the boat, and be released and discharged from all claims, rights, and interests of Halsted and his associates. These associates were defined to be the stockholders of the American Submarine Company at the date.

Tyng, on the tenth of June, as he agreed, bought the boat and apparatus at the sheriff's sale for $2650, and the title and possession were transferred to him by the sheriff. The boat remained, until August thirteenth, on the premises of the Morgan Iron Works, where it had been built.

The company proposed in the prospectus, was not organized in thirty days from the sheriff's sale, or at all; and Halsted did not extend the time for organizing it. From the ninth of July to the eighth of August, Halsted had the

right to purchase the boat and apparatus by making payment as provided for in the agreement. Halsted had, by a letter dated June twelfth, 1865, authorized Tyng to advance such money as he might find desirable or necessary to complete and test the boat, and assumed such advances as if made upon his written orders, provided suitable vouchers were produced for his inspection. Under this authority, Tyng had advanced considerable sums of money to complete and test the boat; and on the twenty-fourth day of July, 1865, without Halsted's consent, launched the boat into the water, and took it to Hunter's Point to finish. Halsted became dissatisfied with Tyng's conduct, and angry and recriminatory letters passed between them, in which Halsted applied to Tyng the most severe and opprobrious epithets, and which would naturally and necessarily induce Tyng to refuse any compromise or any concession, beyond the strict rights which he might be obliged by law to accede to. Halsted, by a letter dated July twenty-fourth, 1865, sent to Tyng, demanded that unless certain propositions contained in it were complied with by the twenty-seventh of that month, Tyng should render him a full and fair account of the moneys expended by him in accordance with the agreement, and of his claim against Halsted and the boat, with the proper vouchers, that he, Halsted, might refund the same, and Tyng re-convey the boat as contemplated by the agreement. This account was not made out or rendered to Halsted; but on the thirtieth day of July, a partial and incomplete account, amounting to $5776.32, was made out, enclosed in an envelope, directed to Halsted, and left at the office of a Mr. Bradley, for him. This account does not appear to have come to the hands of Halsted until after he had called upon Tyng at his office, on the eighth of August.

On the eighth of August, 1865, Halsted called at Tyng's place of business, in New York, for the purpose of procuring the account, and examining the vouchers. Mr. Tyng was not at his place of business, and no account was rendered, or vouchers shown. Halsted left written notice that he would

call again for the purpose, and called about two o'clock, and asked for an account and the vouchers, and said he was ready to settle it, and receive the boat. The account was not ready, but a paper purporting to be a memorandum of disbursements upon the boat, was handed to him. These amounted to $6876.67 ; the items or particulars were not given; the interest was estimated. One item was $800, *to be paid* Serrell for services. On its face, it was not an account in any respect, such as the complainant was entitled to have. Tyng said that his clerk was making out a more detailed account. Halsted objected to the amount of this account, and offered to pay $5000, which he held in his hand in legal tender currency, and to submit the account to referees, and to pay any balance above that sum that might be found due; he to receive back the excess, if it was too much. A dispute and discussion arose, and Halsted left, without having received any more definite account, or being shown the vouchers.

On the eighteenth of September, Halsted and his brother employed a tug boat, and went to Hunter's Point; and in the evening, while the watchman employed by Tyng was absent to get his supper, cut loose the boat, and towed it into the Passaic river. Tyng went in search, found the boat, and procured a search warrant, to have it taken as stolen property.

The bill in this case was filed on the twenty-second of September, 1865, to restrain the officers from delivering the boat to Tyng, and him from receiving it; and praying that, upon his being paid the amount due him according to the agreement of June ninth, 1865, he might be compelled to re-convey the boat and its apparatus to the complainant, and his associates. The boat was afterwards, by both parties, conveyed to trustees, by whom it is held subject to the decision of this court.

There are two questions. The first is, which party is entitled to the possession of the boat. By the sheriff's deed, the title to the boat, and the right to possess it, vested in Tyng. By the agreement of June ninth, Tyng and Halsted had equal and joint possession, during the time allowed for

re-organization; that is, until July eighth, 1865. From that time, by virtue of his ownership, uncontrolled by any agreement, Tyng had the sole control of the boat until it should be redeemed. From that time, Halsted had the right, at any hour, to take the boat from Tyng's control and possession by paying the amounts stipulated, but had no right to the joint control and possession. This was both the letter and the spirit of the agreement. The agreement of June twelfth had no effect upon the possession; it neither enlarged nor diminished the control of Tyng over the boat. Its only effect was that expressed on its face, to obviate the necessity of an order from Halsted for every item expended by Tyng on the boat, and to authorize Tyng to expend such sums as he might deem desirable and necessary to finish the boat.

Tyng's right to the exclusive possession of the boat remained until it should be redeemed, although the authority to expend and advance money on Halsted's account must be considered revoked by the letter of July twenty-fourth, in which Halsted demands an account, and elects to redeem or re-purchase the vessel. All subsequent expenses were at Tyng's own risk.

As the boat was not redeemed and re-conveyed on the eighth of August, Tyng's right to the possession remained; it was his exclusive property. Halsted had no more right to it than a stranger, or than a pawner has to an unredeemed pledge. The taking of the boat from Hunter's Point was, to say the least, an unwarranted trespass, and the possession of it must be restored to Tyng, absolutely and unconditionally.

The second question is, whether Halsted and his associates are entitled to have the boat and its apparatus re-conveyed to them, or to such person as they shall direct, upon paying the amount due according to the agreement of June ninth 1865; or whether they have lost that right, by not paying the amount within the sixty days, which ended on the eighth of August.

Generally speaking, in such an agreement, time is not of the essence; but it may be made so by the nature and subject

matter of the agreement, or by the express stipulation of the agreement itself. In this case it might be a question whether the agreement, from its nature and subject matter, is not one in which time is of the essence. But it expressly makes time the essence of it, by providing that failure to pay at the time, shall end the right.

But although time is the essence of the contract, yet if the failure to comply in time is the fault of the other party, the complainant will not lose his right. In such case, the party claiming the right to be free from his contract by the default of the other party, must himself be without fault. Halsted could not pay, unless Tyng rendered him an account. This account Halsted requested, in his letter of July twenty-fourth; after the receipt of which, Tyng was bound to make out and render his account, and also to cease making any further advances under the letter of June twelfth. The account should have been such as would show on its face, to whom and for what, the moneys had been advanced; and such as, in connection with the vouchers, would have enabled Halsted to judge whether the expenditures had been made to complete or test the boat, and were necessary or desirable for that purpose. Within a reasonable time after the receipt of this letter, such account should have been ready to render to Halsted, at any time that he might call for that purpose; to be examined by him, in connection with the vouchers. He was entitled to know the particulars of every portion of the expenditures, the materials and apparatus purchased, the quantity and price, the nature and amount of services rendered. Such an account was not rendered to him, nor does it appear ever to have been prepared. He went to Tyng's place of business on the last day on which he was to make the tender. Tyng was absent. He left written notice that he would call again at two o'clock. The account then handed to him was such as was not, and ought not to be, satisfactory to him. The vouchers were there, but were not shown to him, or offered to be shown. The memorandum rendered, contained a charge of money *to be paid* to Serrell

for services. Tyng had no right to charge except for what he had actually paid. After the contracts made by Tyng with them, the charges for Merriam's and Serrell's services were, at least, suspicious. Tyng, although not ready with his account and vouchers, was prepared with counsel to answer or evade Halsted's demands. After his letter to Tyng, Halsted may not have been entitled to courtesy or any indulgence, but he was entitled to justice. He was entitled to a correct, intelligible account, and an exhibition of the vouchers. He was entitled to more than the promise of an account in the future, when it could be made out. Such an account as was handed him, should not have been presented. It was calculated, in his situation with Tyng, to vex and irritate him. The whole scene in Tyng's office shows that Halsted, in what he had a right to demand, was not met in a plain, direct, business-like way. He failed to obtain, if he was not directly refused, what he had a right to have without delay, and what he did demand. He had $500.00 in his hands, in legal tender currency; for aught that appears here, it may have been all he was bound to pay. If it were not, he might have been able, if a proper account had been shown, to procure any amount required in addition to it. This is a sufficient excuse for not paying or tendering the exact amount due. By the fault of Tyng, he could not ascertain it. A court of equity will not, under these circumstances, adjudge that the right of Halsted and his associates to redeem the boat and apparatus is lost.

Halsted, in this suit, is entitled to an account. A decree must be made that Tyng, within ten days after service of a copy thereof, on him or his solicitor, shall render to the complainant a full and correct account of all the advances made by him, with a copy of the vouchers; and that within ten days thereafter he appear in person, with the original vouchers, before a master, to be designated in said decree, at such time and place as he shall designate, with eight days notice, and be examined under oath, touching such account; and that the complainant may, at any time in ten days after

such examination, tender to Tyng the amount due to him for such advances. And such tender shall have the same effect, as if made within the sixty days limited in the contract of June ninth, 1865.